FILED

JAN 29 2013

USDC WP SDNY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

JOHANNA N. SIERRA, individually and on behalf of a
class of all others similarly situated,

                               Plaintiff,

          -against-


JP MORGAN CHASE & CO., NCO GROUP, INC.,
BICKERSTAFF, HEATH, DELGADO & ACOSTA, LLP
and JOHN DOES 1-150


                        Defendants.

———————————————————————— x

C.A. No. _____

**ECF CASE**

**CLASS ACTION COMPLAINT**

**13 CV    0656**

JURY TRIAL DEMANDED
ON ALL COUNTS SO
TRIABLE

       Plaintiff Johanna N. Sierra, on behalf of herself and all others similarly situated, by her

attorneys Meiselman, Packman, Nealon, Scialabba & Baker, P.C. as and for her Class Action

Complaint against defendants JP Morgan Chase & Co. ("Chase"), NCO Group, Inc. ("NCO"),

Bickerstaff, Heath, Delgado, & Acosta, LLP ("Bickerstaff") and John Does 1-150 (collectively,

"Defendants"), alleges, with personal knowledge as to her own actions and upon information and

belief as to those of others, as follows:

## NATURE OF THE ACTION

       1.      Defendants have engaged in a long-running and pernicious criminal enterprise

that uses deceptive and unfair debt collection practices to force consumers to pay "debts" they do

not owe.  Defendants' scheme abuses the legal system by seeking judgments for bogus "debts"

which are for amounts larger than consumers actually owe, for "debts" already paid, or for

purely fictitious "debts" made out of whole cloth.  By this action, Plaintiff seeks redress for

Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §

1961 *et seq.* ("RICO"), the Fair Debt Collection Practices Act, 15 U.S.C. § 1926 *et seq.* ("FDCPA"), the Fair Credit Reporting Act, 18 U.S.C. § 1681 *et seq.* ("FCRA"), and the common law.

2.      In an effort to collect money from consumers or to obtain judgments against them to be sold in the unregulated debt market, Defendants took procedural shortcuts and used fraudulent and faulty account records to create false or inaccurate "debts." Chase, NCO and hundreds of debt collection agencies and law firms (Bickerstaff and "John Does 1-150" or "John Does") worked together to sue and otherwise collect from consumers for "debts" that did not accurately reflect the consumers' true credit card debts.

3.      Plaintiff brings this action on behalf of herself and a Class of consumers who have been the subject of Defendants' unlawful debt collection and credit reporting practices. As alleged herein, Defendants systematically and willfully violate the law in their efforts to mass generate judgment accounts from consumer collection accounts, while knowing, or intentionally failing to know, that the consumers do not owe the underlying debt, in whole or in part. Defendants intentionally do not obtain, or cannot obtain, proof that the consumers actually owe the alleged debt, in whole or in part.

4.      Defendants' unlawful scheme enables sophisticated corporate entities to improperly collect vast sums of money from consumers who are usually unaware that they do not owe the money Defendants seek or who lack the resources to defend themselves from Defendants' predatory behavior. As a result of this scheme, Defendants unlawfully obtained hundreds of millions, if not billions, of dollars from consumers.

5.      The primary players in this enterprise are (1) JP Morgan Chase & Co.; (2) NCO Group, Inc., an indirect majority owned and controlled subsidiary of JPMorgan Chase.; and (3)

Bickerstaff and John Does 1-150, a group of law firms and collection agencies throughout the country NCO uses to collect on the purported debts.

6. Chase, one of the nation's largest credit card issuers with more than $137 billion in loans and over 90 million open accounts, and NCO, the Chase subsidiary tasked with collecting on Chase's and other creditors' past due bills, have instituted a debt collection system designed, not to ensure that the so-called "debts" on which it attempts to collect are in fact past due amounts owed by its customers, but instead to ensure that it can collect on as many debts as possible regardless of their validity. Chase and NCO do this by maintaining a haphazard and intentionally inaccurate record-keeping system that results in the creation of bogus debts, either by failing to recognize payments or discharges, by falsely debiting multiple accounts for the same charges, by attributing past due balances to accounts the alleged debtor never actually opened, by fabricating accounts with balances that were never opened by the alleged debtor, by ignoring expired statute of limitations, and/or by other means.

7. In fact, Chase conceded that huge numbers of the so-called debts upon which it tries to collect are bogus when it labeled billions of dollars in "debt" as "toxic" because the documentation of the "debt" was so deficient that it could make no valid claim. Notwithstanding the fact that Defendants know that Chase's records are an insufficient basis to conclude that a consumer owes them a valid debt, Defendants systematically bring debt collection actions without undertaking even a rudimentary investigation to determine whether a "debt" is in fact owed.

8. More troubling, Chase and NCO engage in the deliberate fabrication of evidence supporting debts they know are not valid. Taking a page from the foreclosure crisis, Chase and NCO engage fleets of "robo-signers" who execute affidavits attesting to the validity of debts

3

without making any effort to actually validate the debts, or even to review a single document or the contents of the affidavits they are signing. These affidavits are filed in courts across the nation in what is nothing less than a massive fraud on the courts.

9. Notwithstanding the fact that it knew the toxic debts were invalid, Chase sent many allegedly past due accounts to NCO. NCO then engaged in a sham verification process before attempting to collect on the debt through its network of law firms and collection agencies. In fact, NCO's "verification process" is incapable of uncovering Chase's errors and exists primarily to provide a false appearance of credibility to Chase's fraudulent acts.

10. Defendants also collected on debts they purchased from creditors such as American Express, Citigroup, Bank of America and Capital One (the "Other Creditors"). As with Chase's bogus debts, Defendants had good reason to know that many of the "debts" they bought from Other Creditors were not valid. Indeed, Chase and NCO managers meet with employees of the Other Creditors, and through these monthly meetings, Defendants learned that these companies were sending inaccurate account information to NCO that falsely identified nonexistent "debts." Nonetheless, NCO included those accounts in its computerized collection platform and subsequently bought collection actions on the bogus "debts" of the Other Creditors. NCO is an indirect majority owned and controlled subsidiary of Chase; thus Defendants Chase and NCO benefitted equally from engaging in their unlawful activities regardless of the identity of the original creditor.

11. In order to maximize its profits, and with complete disregard to the rights of its customers or to its obligations, NCO set up a system whereby the debts upon which it attempted to collect were not (and could not be) properly verified, affidavits "verifying" the debts were systematically falsified, and false "debts" were created. NCO and its affiliates then misuse the

legal system to bully innocent consumers into paying hundreds of millions of dollars in un-owed "debt." Chase also sold to third party debt buyers billions of dollars worth of "delinquent" credit card accounts, despite knowing that many of these accounts did not actually exist, or had incorrect or overstated balances. Defendants' scheme represents corporate greed at its worst.

12. Indeed, Defendants' scheme has been widely documented. In February 2012, the Attorneys General of nineteen (19) states entered into a settlement with NCO to resolve allegations of deceptive and unfair debt collection practices, including allegations that consumers were forced to pay NCO for debts which they did not owe. The Attorneys Generals' investigation found NCO violated the FDCPA, FCRA and state consumer protection laws. Pursuant to this settlement, no consumer claims or causes of action were released. Texas, Ms. Sierra's home state, was not a participant in the settlement.

13. Defendants' criminal enterprise was also publicly exposed by Linda Almonte, a financial industry veteran of twelve years and a former Chase and NCO employee. Ms. Almonte was fired from her position as Vice President with Chase after she raised concerns about the legality and appropriateness of Chase's credit card debt collection practices.[1] Ms. Almonte subsequently sued Chase for wrongful termination.

14. Ms. Almonte alleges that Chase required its employees to bundle and sell for further debt collection consumer debts that did not have adequate documentation, debts that listed incorrect balances, debt subject to bankruptcy proceedings, and debts identified as having been reduced to judgment, but which were missing the judgments or were otherwise defective.

---

[1] Ms. Almonte was initially employed by Defendant NCO, where she served as Director of Client Services. Her direct report was a former Chase employee, and she worked with many other former and future Chase employees. Chase then hired her from NCO and made her Vice President of Process Execution, the position from which she was subsequently fired.

The district court denied a motion by Chase to dismiss that lawsuit, after which the parties reached a confidential settlement.

15.     Since her firing, Ms. Almonte has described to Congress, the Securities and Exchange Commission, and the media the massive robo-signing of affidavits and other unlawful practices relating to the creation of false or inaccurate "debts" that she witnessed at Chase and NCO.  During her time at Chase and NCO, Ms. Almonte witnessed the systemic creation and collection of false debts described in detail herein.

16.     Plaintiff Johanna N. Sierra is one of the many victims of Defendants' criminal enterprise.  Ms. Sierra has documented multiple instances in which she paid her Chase credit card debt but Defendants failed to credit Ms. Sierra for those payments.  On at least two occasions, NCO and/or Chase orchestrated efforts to collect on the "debts" that resulted from Defendants' inaccurate record keeping.  On at least one occasion, Defendants created a debt by attributing to Ms. Sierra a credit card account with an unpaid balance that never belonged to Ms. Sierra and which may have never existed.

17.     NCO has hired various other entities to harass Ms. Sierra to collect debts.  For example, in approximately 2007, collection agents working on behalf of NCO called Ms. Sierra at her place of work so frequently that they filled voicemail, making it temporarily impossible for her clients and colleagues to leave voice messages.  Rather than fight this harassment, Ms. Sierra agreed to pay a "debt" that she believed she did not owe so that she could move on with her life.  She signed a contract with Chase wherein Chase represented that it would "stop all efforts to collect."  However, Defendants breached that contract and continued to try to collect "debts" from Ms. Sierra.  Not content with having extorted thousands of dollars from Ms. Sierra, NCO

and Chase are currently orchestrating baseless litigation against Ms. Sierra that originated in Texas state court.

18.     Ms. Sierra is not alone, as tens of thousands of consumers have been sued in courts nationwide as a result of Defendants' efforts to turn questionable and unverified consumer debt or collection accounts into enforceable court judgments, regardless of whether the consumer actually owes the alleged underlying debt.  By this lawsuit, Ms. Sierra seeks redress for Defendants' unlawful actions, on behalf of herself and on behalf of a class of similarly situated consumers.

## PARTIES

19.     Plaintiff Johanna N. Sierra is a resident of Round Rock, Texas and was a Chase credit card holder from approximately July 2003 through July 2006.  On numerous occasions, Defendants collected credit card "debt" from Ms. Sierra that was not actually owed.  Ms. Sierra is currently a defendant in a baseless lawsuit brought by Bickerstaff seeking to collect on a fabricated credit card "debt."

20.     Defendant JP Morgan Chase is headquartered in New York, New York.  Chase is a multinational corporation with assets exceeding $2 trillion.  Chase is a debt collector and furnisher of information to credit reporting agencies.

21.     Defendant NCO Group, Inc. is a Delaware corporation headquartered in Horsham, Pennsylvania.  NCO is a business process outsourcing company and collection agency that works with many companies to collect on debts.  NCO reported $1.2 billion in revenue in 2011.  Much of NCO's revenue comes from its unlawful efforts to conspire with the other Defendants to wrongfully obtain funds from Ms. Sierra and thousands of others.  NCO is an

indirect majority owned and controlled subsidiary of JP Morgan Chase. NCO is a debt collector and furnisher of information to credit reporting agencies.

22.   Defendant Bickerstaff, Heath, Delgado, & Acosta, LLP is a law firm headquartered in Austin, Texas. Bickerstaff employs approximately 32 attorneys and works to collect "debts" referred to it by NCO. Bickerstaff has engaged in baseless litigation in an effort to extract money from Ms. Sierra and from other members of the class.

23.   John Does 1-150 are a collection of law firms and debt collection agencies that contract with NCO to collect "debt" from consumers. John Does consistently collect on debts that are not valid and rely on fraudulent affidavits created by NCO. Although the names and locations of the Defendant Does 1 through 150 are not known to Plaintiff at this time, Defendant Does 1 through 150 can be readily identified in the books and records of Defendant NCO Group, Inc. Does 1 through 150 are debt collectors and furnishers of information to credit reporting agencies.

## JURISDICTION AND VENUE

24.   This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332(d), 15 U.S.C. § 1692k(d) and 18 U.S.C. §§ 1961-68.

25.   Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965. This Court has personal jurisdiction over Defendants because a substantial part of the events or omissions giving rise to the claims occurred in this District. Chase is headquartered in this District, and most of the policies and procedures challenged by this lawsuit originated in this District.

8

## FACTUAL ALLEGATIONS

### The Debt Collection Industry Is Rife With Abuse

26.     When consumer credit card accounts and other consumer loans go past due, they become "collection accounts."  In order to get the collection accounts off its balance sheet, the original creditor may sell the consumer collection accounts to debt buyers, for which they pay pennies on the dollar.  Debt buyers may seek to collect on the debts or resell the debt portfolios to another debt buyer.  It is not uncommon for debts to be bought and sold numerous times over.  There is even an active market for debts that are past the statute of limitations and for debts that previously have been discharged in bankruptcy.

27.     Each time a debt is resold, it becomes less likely that the purchaser will be able to obtain actual documentation of the alleged debt.  As a result, most debt buyers have significant difficulty substantiating their claims.  This has been widely recognized as a problem for the industry with an adverse impact on consumers.

28.     Increasingly, debt buyers are commencing debt collection lawsuits in order to collect from consumers.  Debt buyers, however, generally do not obtain account documentation prior to commencing a lawsuit against a consumer for debt collection.  Furthermore, because purchase and sale agreements severely restrict or eliminate debt buyers' ability to obtain documentation of the debts from the original creditor, debt buyers are unable to obtain knowledge or evidence of the alleged consumer debt.  However, debt buyers are rarely required to prove their allegations through actual evidence of the alleged underlying consumer debt because consumers often fail to appear to defend themselves in court as the cost of such defense would in almost all circumstances far eclipse the debt owed.

29.     Consumer collection accounts which have been turned into enforceable court judgments through debt collection lawsuits command a much higher value in the debt market than collection accounts which have not been reduced to a judgment.  Once the collection account has been reduced to a court judgment, the owner of the judgment can use harsh post-judgment collection remedies, including wage garnishment, attachment of bank accounts, and asset seizure.  Thus, in the debt market, a portfolio of "judgment accounts" is worth significantly more than a portfolio of "collection accounts."

30.     The Honorable Noach Dear, a civil court judge in Brooklyn, New York stated, "I would say that roughly 90 percent of the credit card lawsuits are flawed and can't prove the person owes the debt."

31.     As The New York Times reported:

> Interviews with dozens of state judges, regulators and lawyers, however, indicated that such flaws are increasingly common in credit card suits. In certain instances, lenders are trying to collect money from consumers who have already paid their bills . . . . The problem, according to judges, is that credit card companies are not always following the proper legal procedures, even when they have the right to collect money. Certain cases hinge on mass produced documents because lenders do not provide proof off outstanding debts, like the original contract or payment history.

"Problems Riddle Moves to Collect Credit Card Debt," by Jessica Silver-Greenberg, The New York Times, August 12, 2012.

32.     According to the Federal Trade Commission ("FTC"), "[w]hen accounts are transferred to debt collectors, the accompanying information often is so deficient that the collectors seek payment from the wrong consumer or demand the wrong amount from the correct consumer."  *See* FTC, "Collecting Consumer Debts: The Challenges of Change" (2009) at 22, (available at http://www.ftc.gov/bcp/workshops/debtcollection/dcwr.pdf).

33.     Credit card issuers and other companies are basing lawsuits on incomplete or false paperwork, with their illicit actions often going undetected.  Unlike foreclosures, consumers typically do not show up in court to defend themselves.  Moreover, the cost of defending bogus collection actions typically eclipses the debts themselves, and thus as a matter of economic necessity, many consumers are forced to pay invalid debts rather than defending themselves.

34.     Moreover, the threat of reduced credit ratings that can result from even bogus debt collection actions forces many consumers to pay debts they know are invalid:

> [T]he judgment will impose costs on the consumer by damaging the consumer's credit rating . . . [which] does more than merely raise the consumer's cost of credit. A damages credit score can make it difficult to rent an apartment, find a job, or even purchase automobile insurance . . . credit reports typically do not record the filing of the lawsuit, but they do record judgments. Therefore, a civil filing serves as a credible threat to inflict harm on the [consumer] defendant and may induce the [consumer] defendant to pay.

Richard Hayes, *Broke But Not Bankrupt: Consumer Debt Collection In State Courts*, 60 Fla. L. Rev. 1, 20 (2008).

35.     As a result, debt collectors have flooded the court system with actions to collect on consumer debt, including debt which is already paid-off or time barred.  Indeed, in 2009, the FTC received 37,052 complaints from consumers stating that they had been targeted by debt collectors who were trying to collect debts that were not owed, in amounts over what was owed, or which had been discharged.  *See* Federal Trade Commission, Annual Report 2012: Fair Debt Collection Practices Act. p. 6-10 (available at www.ftc.gov/os/2010/P104802fdcpa2010 annrpt.pdf).  The FTC noted that its 2009 data, however, "may understate the extent to which consumers have concerns about the practice of debt collectors" because consumers generally

may not be aware of the FTC's enforcement role or may only file complaints with collectors, creditors or other enforcement agencies. *Id.* at 2.

### Chase's Inaccurate Handling Of Credit Card Accounts Results In Bogus Debts

36.     Chase is one of the largest credit card lenders in the country, with approximately $137 billion worth of credit issued through more than 90 million cards.  In 2000, Chase recouped $130 million from bad consumer debt.  By 2009, using the practices described herein, Chase's recoveries on consumer credit card debt alone exceeded $1.2 billion.  Chase's recovery of, and profit from, consumer debt is accomplished through its subsidiary, NCO.

37.     To service its massive credit card business, Chase maintains a large central database of its credit card accounts, which is called the "System of Record."

38.     The System of Record keeps track of information about each credit card account, such as the current balance, the current amount due, a history of payments, and borrower-specific credit limits.  Unfortunately for Ms. Sierra and other victims of Defendants' scheme, the System of Record also systematizes and legitimizes inaccuracies in Chase's record-keeping.  During her time with Chase and NCO, Ms. Almonte witnessed the systemic creation and collection of false debts, using the System of Records and other programs.

39.     The System of Record allows Chase to keep track of on-time and delinquent accounts and allows for the creation of specific status codes based upon the borrower's payment status.  One such status option is to code a credit card account as in "litigation," which means that Chase has elected to sue the credit card borrower for the unpaid balance.  Once an account is coded "litigation," it is referred to as a "Litigation Account."

40.     Chase had approximately $5 billion dollars of aggregate accounts deemed Litigation Accounts in 2009.

41.     After a credit card account becomes a Litigation Account, it is transferred to the "Credit Card Litigation Department," and the System of Record is no longer the primary database to record and maintain facts and information as the Credit Card Litigation Department has its own databases and record keeping processes.

42.     Within the Credit Card Litigation Department is a group of employees called the "Pre-Litigation Group" that is responsible for assimilating all information and documents necessary to file a lawsuit against the borrower for the unpaid balance.

43.     The Pre-Litigation Group makes a final attempt to collect the unpaid balance by sending to the client written notice of Chase's intent to sue and also telephoning the consumer to orally deliver a final demand for payment.  The Pre-Litigation Group is also responsible for incorporating all inbound communications from account holders from the time the credit card account is marked for litigation on the System of Record until the account is assigned for actual litigation.

44.     These inbound communications include bankruptcy notices, settlement offers, statement disputes, powers of attorney, notice of cancelation of auto-pay, proof of payment, and communications from debt settlement and credit counseling companies.

45.     However, the Pre-Litigation Group routinely destroyed or misplaced such communications or failed to timely incorporate the information contained in these communications into the Litigation Database.  The result is that the Litigation Database often indicates a debt is owed when it is not.

46.     Furthermore, senior Chase executives instructed Chase employees to remove important information and data from Litigation Accounts, as the retention of the information

13

would have resulted in increased storage costs.  Removing important consumer information further rendered the information in the Litigation Accounts inaccurate and unreliable.

47.     When the Pre-Litigation Group is unable to collect on the unpaid balance, or when it fails to properly record the collection of a debt, the debt is handed over to the Litigation Group.  The Litigation Group either uses its own group of lawyers to litigate unpaid accounts, or it assigns a Litigation Account to a preapproved third party law firm through NCO (one of the John Does).

48.     Chase is fully aware that many of the debts upon which it directs NCO to collect are bogus.  Indeed, when Chase's internal paperwork relating to a debt is sufficiently contradictory or haphazard, Chase labels the debt as "toxic" for internal purposes.  Chase specifically labeled debts relating to the accounts that it acquired from Providian and Washington Mutual as "toxic."  This included Ms. Sierra's real account with Providian and a non-existent Washington Mutual Account which Defendants attributed to Ms. Sierra.

49.     While at NCO, Ms. Almonte met monthly with certain Chase employees.  During these meetings, she learned that Chase knew they were sending NCO inaccurate "debts."

50.     NCO, at the direction and with the assistance of Chase, has flooded the courts with mass-produced lawsuits, many of which are for the collection of bogus debts.  NCO employs a network of at least 150 debt collection affiliate law firms nationwide to commence the debt collection lawsuits on behalf of NCO and/or the credit card issuers against consumers.

**Chase Executes False Affidavits To Justify Bogus Debts**

51.     The Litigation Group supports litigation activity by providing both in-house lawyers and NCO with executed affidavits in support of lawsuits brought to reduce unpaid balances to judgment ("Judgment Affidavit").

14

52.     These Judgment Affidavits are created by a handful of employees (the "Affidavit Signers"), many of whom do not possess the requisite knowledge of the underlying facts to properly sign the Judgment Affidavits.

53.     Because there are material differences in the account data contained in the System of Record and the Litigation Database, and owing to the relative unreliability of the latter, the information and facts set forth in a Judgment Affidavit required a meaningful reconciliation among the System of Record (including the multiple legacy databases that compromise the System of Record) and the Litigation Database.  At no time did the affidavit signers perform this reconciliation.

54.     The Affidavit Signers made little or no effort to verify the contents of the affidavits they signed.  Indeed, on numerous occasions, Ms. Almonte witnessed these Affidavit Signers work through 3-feet tall stacks of Judgment Affidavits while focusing on other matters during weekly, multi-hour company meetings that were not related to the Judgment Affidavits. Ms. Almonte has testified that "[i]t was well known throughout my department [at Chase]" that Affidavit signers "would frequently, if not exclusively, sign affidavits without having any personal knowledge whatsoever of the account the affidavit referred to."

55.     Incredibly, the Affidavit Signers bragged about how quickly they could sign Judgment Affidavits.  For example, Ms. Almonte witnessed Affidavit Signer Ruben Alcarez boast that he was able to "bang out" (i.e. complete) over 500 affidavits during one single plane trip.

56.     Moreover, the Judgment Affidavits were notarized in mass by notaries who did not witness the signing.  Indeed, Ms. Almonte testified that she "literally never witnessed a notary public notarize any Affidavit in front of the person who actually signed the affidavit."

57.     Ms. Almonte is not the only whistleblower.  Howard Hardin, who oversaw a team handling tens of thousands of Chase debt files in Ms. Sierra's home state of Texas, recently told the American Banker that "[w]e did not verify a single one" of the Judgment Affidavits.  Mr. Hardin explained that "[w]e were told [by superiors] 'we're in a hurry.  Go ahead and sign them.'"

58.     Furthermore, senior Chase executives instructed Chase Bank employees to remove important information and data from Litigation Accounts, as the retention of the information would have resulted in increased computer hardware costs.  Removing important consumer information further rendered the information in the Litigation Accounts inaccurate and unreliable.

### Defendant NCO Engaged Bickerstaff and
### John Does 1-50 To Collect On Huge Numbers Of False Debts

59.     In servicing Chase (and other) accounts, NCO and John Does consistently "validated" and collected on inaccurate "debts."  Shockingly, NCO exacerbated the problem, often creating new false debts, which it then worked with John Doe Defendants to collect.  NCO continually files lawsuits through John Does 1 through 150 against alleged consumer debtors based on scant and unverified information.  In addition to Chase, NCO services among others, American Express, Discover Card, Capitol One, Applied Card, and Bank of America.

60.     Indeed, tens of millions of consumer accounts have been subject to NCO's illicit practices.  The volume and pace of debt collection lawsuits has outstripped the record-keeping capabilities of the lawsuit originators, the result of which is lawsuits targeting consumers who have repaid their debts or otherwise do not owe the debts alleged, like Plaintiff.

61.     In fact, NCO has knowingly failed to invest in the infrastructure necessary to keep track of vital information about the consumer collection accounts which are passed between debt

buyers, debt collectors, and lawyers, and which have become the subject of debt collection lawsuits filed en masse. Rather than establish reliable internal controls, Defendants intentionally obfuscate the consumer loan history. This makes it difficult for debt buyers, debt collectors and affiliate law firms to verify the accuracy of the underlying debt allegedly owed by the consumer. Defendants knowingly fail to maintain the integrity of consumers' loan information, and they willfully fail to ensure the accuracy of the representations which they make to affiliate law firms, consumers and the courts about the alleged debts.

62.     Ms. Almonte witnessed the systematic inaccuracies created during the process by which NCO uploaded debt information from Chase and other original creditors into NCO's collection platform (the "NCO Computer System").

63.     Simply put, information was often inaccurately entered into the NCO Computer System, thereby creating incorrect and even false debts. Sometimes, as likely happened to Ms. Sierra, "debt" was assigned to one account, meaning that NCO would receive documentation of a "debt" owed on a Chase credit card, and record the same debt as being owed on another credit card, in addition to the Chase credit card.

64.     In addition, Chase and other original creditors working with NCO only sent over information about the debt at a fixed point in time, and lacked the means and motivation to communicate with NCO in the event that a consumer subsequently paid the debt. In that event, Chase would often simply pocket the money, while NCO then worked to re-collect the money.

65.     NCO uses a standard "on boarding" procedure for collection accounts. Each original creditor or debt owner sends NCO in batch form selective electronic consumer information, which NCO then uploads onto its computerized collection platform. The electronic consumer information received by NCO is intentionally scant and fails to contain any legacy

17

information concerning the consumer's loan and payment history. NCO notifies the consumer of the collection account transfer to NCO by a single letter sent to the consumer's last known address.

66.     Because NCO does not obtain or upload the legacy consumer loan information onto its computerized collections platform, NCO can never verify the accuracy of the limited data points in the electronic consumer information which is uploaded to the collection platform. The electronic consumer information which NCO does obtain, moreover, fails to provide critical information concerning the underlying account, such as the original loan agreement, the payment history, notices of bankruptcy filings, court ordered discharges, settlements, cease and desist orders, notice of death of consumers and other important information that would verify whether the alleged debt was in fact valid. Neither NCO nor the original creditor performs any due diligence on the electronic consumer information before uploading it to the computerized collection platform at NCO. NCO, moreover, requires no data retention practices on behalf of the original creditor or debt owner during the uploading or "on boarding" process.

67.     Even though Chase and NCO were aware that many of the "debts" sent from Chase to NCO, and from NCO to credit collection firms, were inaccurate, Defendants made no effort to correct these errors. Indeed, the same "debt" would often be sent for collection on multiple occasions.

68.     Chase and NCO were also fully aware that the collection accounts they received from Other Creditors contained false information regarding the alleged debt. Every month, Chase and NCO managers would meet with employees of certain original creditors and debt owners, including American Express, Citigroup, Bank of America and Capital One. Through these monthly meetings, it came to be known at Chase and NCO that all of these companies were

sending inaccurate consumer collection account information to NCO as part of the electronic consumer files which were uploaded onto NCO's computerized collection platform. Moreover, these companies routinely pressured NCO to file more debt collection lawsuits faster in order to turn collection accounts into the more valuable judgment accounts. NCO thus was and is in charge of the debt collection lawsuits brought on behalf of these original creditors, even where the lawsuits are commenced in the name of the original creditor. Defendants thus know, or reasonably should know and intentionally and recklessly fail to know, that consumer debt which they have sought, and continue to seek, to collect upon is debt which is not owed by the consumer.

69.     NCO's computer systems are supposed to manage the process of collecting consumer debt and/or reducing that debt to a court judgment. However, NCO's computer systems are rife with known glitches which make the systems unreliable and which generate erroneous information concerning consumer collection accounts. Rather than correct these known glitches, NCO has come to rely on them to increase profits. Among the many glitches in NCO's system was a long-lasting bug known as the "RBA Bug," which is short for "returned by automation."

70.     The RBA Bug impacted tens of thousands, and possibly hundreds of thousands, of accounts and its effects were particularly pernicious. When an Affiliate Law Firm settled an account and reported back "Settled in Full" or "Paid in Full" into the NCO ESE system, the RBA Bug would lose or delete that information, and it would automatically report that the account was closed without any payment. NCO would then often send the debt to another law firm. This subjected many people, likely including Ms. Sierra, to collection of debts that they properly paid.

71.     NCO, moreover, relies on the P-code to provide updated information to credit bureaus concerning the status of the consumers' loans.  As a result, and in light of NCO's knowledge of, and failure to remedy, the RBA Bug which prevented the P-code from being uploaded to individual consumer collection accounts, Defendants knowingly provided credit bureaus with false and erroneous information about consumers' loan status.

72.     If a consumer questioned a debt that NCO sought to collect on Chase's and the Other Creditors behalf, NCO often immediately moved to litigate, rather than working with Chase to properly determine whether the debt was paid.

73.     Indeed, Defendants' scam is very effective in victimizing the average consumer. Consumers would receive threats and lawsuits to pay amounts they "owed" to Chase or Other Creditors.  The threats and lawsuits would be accompanied by official documents documenting the "debt."  Many people would simply assume they owed the money and pay the debt.  Others, who initially challenged the debt, would back down shortly after NCO enlisted John Does and had professional law firms sue to collect the "debt."  Even the rare consumer who had fully documented all payments would be faced with official documents from Defendants that ostensibly discredited the consumers' accurate records.

**NCO Intentionally Fabricates Affidavits To Justify Debt Collection Cases**

74.     Rather than properly verifying the validity of a debt before filing a collection claim in court, NCO, like Chase, perpetrated a massive fraud on the courts by facilitating and engaging in large scale robo-signing.  In fact, NCO uses automated computer programs to convert the inaccurate information it uploaded from Chase into form affidavits "verifying" the debt it sought to collect.

20

75.     NCO processed information for hundreds of thousands of consumer accounts a month, and "verified" affidavits on a massive scale.  Ms. Almonte observed that no real attempt was ever made to verify the information on the affidavits.  NCO then sent the form affidavits to Chase and other creditors, who automatically signed the affidavits, again without review.  The affidavits would then be sent back to NCO, sorted again (with even more errors created, as the affidavits could be sent to the wrong files), and sent out to various law firms for debt collection.

### Defendants' Systematic Victimization of Ms. Sierra

76.     Johanna N. Sierra is the Business Control Manager of a Fortune 100 company's Global Operations.  She is also a Certified Public Accountant and Certified Fraud Examiner.

77.     In the summer of 2003, Ms. Sierra opened a credit card account with Providian.  Chase purchased the Providian Master Trust in February 2002.  In July 2004, Chase converted Ms. Sierra's Providian credit card into a Chase Platinum Card.

78.     Ms. Sierra's Chase Platinum Card was her only credit card account with Chase; she satisfied her obligations under that card.  Ms. Sierra never had any other credit cards owned by Chase or Washington Mutual.  Nonetheless, Defendants attempted to collect on multiple "debts" that Ms. Sierra did not owe.

79.     Ms. Sierra closed her Chase Platinum Card account in 2006, when she moved to Brazil.

80.     Ms. Sierra paid significant money to Chase (sometimes via NCO and John Does) for use of this card.  In fact, Ms. Sierra paid the same "debt" twice, and NCO and John Does are attempting to force her into paying the debt a third time.

81.     When, in 2011, Defendants attempted to collect on "debts" that Ms. Sierra strongly believed she had already paid (and that never existed in the form in which Defendants were collecting), Ms. Sierra stood up to Defendants.

82.     As a result, NCO is orchestrating litigation against her in Texas state court.

83.     Ms. Sierra responded to the 2011 threats by investigating her Chase accounts and the related actions by NCO.  Working with Ms. Almonte and others, including another certified fraud examiner, in 2012 Ms. Sierra was able to document numerous instances where Defendants attempted to collect from her on "debts" that she had plainly paid.  Ms. Sierra did not become aware of the unlawful nature of Defendants' efforts to collect on debts until approximately October of 2011.

84.     However, Defendants' unlawful activity took place over a long period of time.

85.     For example, on June 19, 2006, a debit of $410.00 was posted to Ms. Sierra's University Federal Credit Union ("UFCU") checking account.  The debit was an automatic payment originated by Chase.

86.     The payment of $410.00 to Chase is plainly reflected in Ms. Sierra's UFCU bank statement.   Her balance decreased by the exact amount of the withdrawal.

87.     However, the payment of $410.00 is not reflected in Ms. Sierra's credit card statements from Chase.

88.     Similarly, on July 18, 2006, a debit of $402.00 was posted in Ms. Sierra's UFCU checking account.  The debit was an automatic payment originated by Chase.

89.     The payment of $402.00 to Chase is plainly reflected in Ms. Sierra's UFCU bank statement.   Her balance decreased by the exact amount of the withdrawal.

90.     However, the payment of $402.00 is not reflected in Ms. Sierra's credit card statements from Chase.

91.     Again, on August 28, 2006, a debit of $450.00 was posted in Ms. Sierra's UFCU checking account.  The debit was an automatic payment originated by Chase.

92.     The payment of $450.00 to Chase is plainly reflected in Ms. Sierra's UFCU bank statement.  Her balance decreased by the exact amount of the withdrawal.

93.     However, the payment of $450.00 is not reflected in Ms. Sierra's credit card statements from Chase.

94.     Yet again, on September 25, 2006, a debit of $500.00 was posted in Ms. Sierra's UFCU checking account.  The debit was an automatic payment originated by Chase.

95.     The payment of $500.00 to Chase is plainly reflected in Ms. Sierra's UFCU bank statement.  Her balance decreased by the exact amount of the withdrawal.

96.     However, as with the other above-described payments, the payment of $500.00 is not reflected in Ms. Sierra's credit card statements from Chase.

97.     Ms. Sierra only realized that Chase had not credited her for the above-listed payments when she scrutinized her billing history in early 2012.

98.     Subsequently, Ms. Sierra learned that her account was "serviced" by NCO in 2007.

99.     In late 2007 and early 2008, a law firm acting on behalf of NCO stated that it could document approximately $21,120.98 in unpaid debt which Ms. Sierra owed to Chase.

100.     Ms. Sierra initially attempted to fight the debt collection effort, and stated that she believed the claimed "debt" was inaccurate.

101.    NCO employees started calling Ms. Sierra at her job.  These employees told Ms. Sierra that it would immediately commence litigation if she did not pay the debt.  Once, after Ms. Sierra returned from a business trip, her work voicemail had been filled by NCO employees.

102.    Ms. Sierra consulted with a lawyer who told her it would be cheaper and easier to settle than to fight NCO in court.

103.    Accordingly, on February 25, 2008, Ms. Sierra settled to avoid litigation, paying a total of $9,000 in full satisfaction for all "debts" allegedly owed to Chase.

104.    The February 25, 2008 settlement agreement, drafted on Chase letterhead, states, *inter alia*:

> [W]e are pleased to confirm that we've agreed to settle your credit card account for $9,000.00[.]   Our settlement brings you these three advantages:
>
> • You will pay $9,000.00, a significant savings over the full balance that you owe us.  Please note that the settlement amount doesn't include any payments you may have already previous [sic] to this settlement agreement
>
> • <u>We will stop all efforts to collect</u>
>
> • We will report your account to the national credit bureaus as "settled[.]"

(Emphasis added).

105.    Ms. Sierra fulfilled her obligations under this contract; she paid Chase the $9,000.00.

106.    Not surprisingly, NCO and/or Chase again failed to process the payment.

107.    In December, 2010, Ms. Sierra was considering purchasing another home.  She looked at her credit report, and was shocked to learn she had an account in collections with "SST/CIGPF1Corp."  The account was allegedly in arrears for $24,224.00.  "SST" is the

commonly used abbreviation for Systems & Services Technologies, Inc., a subsidiary of NCO. CIGPF1Corp is an independent company that shares the same address as Chase.

108.    In January of 2011, Ms. Sierra, through counsel, contacted SST and NCO to inquire into the nature of the alleged "debt" and to have the "debt" removed from her credit report. SST stated that NCO was handling the "debt."

109.    On January 13, 2011, Ms. Sierra received a letter from SST. The letter stated that SST was contracted to service Ms. Sierra's Washington Mutual account in March 2007. Ms. Sierra never had any credit cards or accounts with Washington Mutual. This is corroborated by the fact that her April 24, 2009 credit report makes no mention of any Washington Mutual credit card.

110.    Moreover, it defies common sense to believe that Ms. Sierra had an account with Washington Mutual that NCO serviced in 2007, yet neither NCO nor Washington Mutual nor any entity reported the "debt" to a credit agency until late 2010.

111.    In fact, the alleged "Washington Mutual Credit Card" account ended in the exact same last four digits as convenience checks that Ms. Sierra received from Chase in late 2004. Significantly, Ms. Sierra owed no debt on this account. Upon information and belief, the Washington Mutual account was a fictitious account that was created as a result of Defendants' criminal enterprise. Chase acquired Washington Mutual over the course of 2008 and 2009, and Chase planned the acquisition for several years prior. On information and belief, Chase's well documented in-house record keeping problems resulted in Chase wrongly categorizing Ms. Sierra's paid debt to Chase as an unpaid "debt" to Washington Mutual. Indeed, Chase categorized as "toxic" its debt relating to Washington Mutual and its "debt" relating to Providian.

112.    In an effort to learn more about this alleged "debt," Ms. Sierra recently spoke to the manager of Chase Bank at 1000 East 41st Street in Austin, Texas.  That manager stated to Ms. Sierra that her name and social security were not linked to the account at issue on the Chase system.

113.    Nonetheless, on February 1, 2011, Ms. Sierra received a letter from a law firm, stating that SST had assigned the account to NCO.

114.    Ms. Sierra then contacted NCO, explained that she owed no debt, and requested that the "debt" be removed from her credit report.

115.    On February 21, 2011, Ms. Sierra received a letter from counsel for NCO.  The letter stated:  "NCO has made the business decision to close the above referenced account" and indicated that the "debt" would be removed from Ms. Sierra's credit report.

116.    On March 1, 2011, NCO's attorney backtracked by phone.  NCO's attorney stated that the "debt" was valid.  However NCO's attorney assured Ms. Sierra that NCO would not attempt to collect the debt.

117.    On March 2, 2011, Ms. Sierra, through counsel, contacted NCO.  Ms. Sierra indicated that she would litigate if NCO did not remove the false report from her credit report.  NCO reversed course again and stated that the "debt" was not owned by NCO, but rather by SST/CIGPF1.

118.    On March 14, 2011, Ms. Sierra filed suit in Texas State Court against SST and affiliates, but not against NCO.  The defendants in that lawsuit did not file any counterclaims.

119.    By March 21, 2011, the "debt" was removed from Ms. Sierra's credit report.

120.    On April 4, 2011, on the advice of her counsel, Ms. Sierra voluntarily withdrew the lawsuit, because she accomplished her goal when the false "debt" was removed from her credit report.

121.    Ms. Sierra closed on her house on April 5, 2011.

122.    Ms. Sierra put the matter behind her.  She believed she would be able to go on about her life without having to deal with NCO and its army of co-conspirators.

123.    Then, on August 12, 2011, Ms. Sierra was sued in Texas State Court by SST, for the "outstanding debt" to Washington Mutual of $42,957.88 that had been removed from her credit report.

124.    SST effected service on Ms. Sierra's prior home, and Ms. Sierra only found out about the lawsuit because the person to whom she had rented her home contacted her.

125.    SST's complaint and lawsuit rely on a false affidavit prepared by NCO that attests to "debt" that, in actuality, never existed (to the extent the "debt" is based on Ms. Sierra's non-existent Washington Mutual account) or has repeatedly been paid (to the extent the "debt" is based on Ms. Sierra's Chase account).

126.    Despite repeated requests for proof, Defendants and SST have never been able to produce satisfactory evidence that Ms. Sierra had an account with Washington Mutual.  For example, Defendants and SST have never produced a single valid Washington Mutual account statement for Ms. Sierra.

127.    Nonetheless, Ms. Sierra is currently mired in litigation.  Ms. Sierra, who is litigating *pro se*, appeared in front of the state court judge once.  During that appearance, Ms. Sierra stated that the debt was fraudulent and she asked that plaintiffs be compelled to produce statements from Washington Mutual.  The judge replied that he was tired of debtors requesting

documents that they should already have and that Chase is "a very profitable financial institution" that has "no need to be involved in fraud." However, the judge also expressed disappointment that SST's counsel cannot produce documentation that Ms. Sierra had an account with Washington Mutual. Although it is plainly obvious that the claims against Ms. Sierra are baseless and should be dismissed, the overworked judge ordered the parties into mediation and ordered the parties to equally share in the costs of mediation, thereby forcing Ms. Sierra to incur additional expenses. Ms. Sierra recently removed the case to federal court.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

128.   To the extent Defendants seek to assert any statute of limitations as a defense, the doctrine of equitable tolling applies as Defendants deliberately concealed the scheme Ms. Sierra only recently discovered. Ms. Sierra was extraordinarily diligent in uncovering this scheme, and manifest injustice would ensue if Defendants were allowed to use the statute of limitations to shield them from liability for their inequitable behavior.

129.   Defendants have engaged in deceptive, misleading, and fraudulent efforts to conceal the true nature of their unlawful conduct from Plaintiff, the Classes and Subclasses through acts of omission and misrepresentations. Defendants have intended to and have, in fact, accomplished their concealment through misrepresentations and omissions, as described herein.

130.   As a result and proximate cause of Defendants' concealment and because Defendants represent or represented that debts are owed, or owed in the amounts represented, Class and Subclass members were likely to be reasonably unaware of Defendants' unlawful acts and the claims alleged in this action.

131.   A reasonably diligent consumer, including members of the Class and Subclasses, could not have learned of their claims alleged in this action, or all the material events giving rise

to their claims in this action, prior to the filing of this lawsuit. The claims alleged in this action have been tolled since that time.

133. 132. Class and Subclass members' lack of knowledge as to the existence of their claims against Defendants was not due to any fault or lack of reasonable diligence on their part, but rather due entirely or substantially to the acts of Defendants designed to conceal and hide the true nature of their unlawful conduct. To the contrary, Plaintiff has been diligent in bringing her claims in this action, both individually and on behalf of the Class and Subclasses.
Class and Subclass members' claims alleged in this action were tolled, equitably and/or as a result of Defendants' fraudulent concealment, at least until the filing of this action. To the extent it is asserted by Defendants that any of Plaintiff's individual claims are untimely, Plaintiff's claims (to the extent not timely) were tolled, equitably and/or as a result of Defendants' fraudulent concealment.

## CLASS ACTION ALLEGATIONS

133. Ms. Sierra brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons against whom any or all of Defendants collected or attempted to collect a "debt" that was not valid (the "Class").

134. Ms. Sierra also brings this action on behalf of all persons regarding whom Defendants have furnished, or failed to correct information they have furnished, or which they knew was furnished, to consumer reporting agencies that is false, deceptive and/or misleading (the "Consumer Reporting Subclass").

135. Mrs. Sierra also brings this action on behalf of all persons who contractually paid all of their "debt" at the request of a Defendant and later suffered injury when a Defendant(s)

continued to collect on "debts" (the "Breach of Contract Subclass") (collectively, with the Class and the Consumer Reporting Subclass, the "Classes").

136.    The Classes are all so numerous that joinder of all members is impracticable.

137.    There are numerous questions of fact and law common to the Classes that predominate over issues affecting only individual class members, including, but not limited to, the following:

a.    Whether Defendants failed to properly record payment of debts;

b.    Whether Defendants' failure to properly record payment of debts was due to policies which made the failure to record debts systematic;

c.    Whether Defendants created new debts by erroneously transferring account balances to different cards;

d.    Whether Defendants engaged in robo-signing to systematically create inaccurate affidavits;

e.    Whether Defendants have orchestrated debt collection efforts which seek to collect on consumer debt which Defendants know, or reasonably should know, is debt which is not owed, in whole or in part, by the consumer;

f.    Whether Defendants violated RICO;

g.    Whether Defendants violated FDCPA;

h.    Whether Defendants violated FCRA; and

i.    Whether Defendants breached contracts to stop efforts to collect on alleged debts.

138.    Ms. Sierra's claims are typical of those of the other members of the Classes and Defendants owed the same duties to all of them.

139.    Ms. Sierra will fairly and adequately protect the interests of the Classes as she is familiar with the claims made herein, and she is committed to the vigorous prosecution of this case.  There are no intra-class conflicts since all members of the Classes have the same interest in recovering any and all losses and damages incurred as a result of Defendants' scheme, and all class members have the same interest in injunctive relief that puts an end to Defendants' unlawful activities.  In addition, Ms. Sierra has retained experienced and competent counsel who specializes in complex class action litigation to represent her and the Classes.

140.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

a.    Absent a class action, members of the Classes as a practical matter will be unable to obtain redress, Defendants' violations of its legal obligations will continue without remedy, additional consumers will be harmed, and Defendants will continue to retain their ill-gotten gains;

b.    It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions;

c.    When the liability of Defendants have been adjudicated, the Court will be able to determine the claims of all members of the Classes;

d.    A class action will permit an orderly and expeditious administration of Classes' claims and foster economies of time, effort, and expense; and

e.    The lawsuit presents no difficulties that would impede its management by the Court as a class action.

<u>COUNT I</u>
**CIVIL RICO (18 U.S.C. §§ 1962 *et. seq.*)**
**(On Behalf Of Plaintiff And All Classes)**

141.    Plaintiff adopts and incorporates by reference the foregoing Paragraphs of the Complaint as if fully set forth herein.

142.    Ms. Sierra is a natural person and, as such, is a person within the meaning of 18 U.S.C. § 1961(3).

143.    Defendants are corporate entities and, as such, are "persons" within the meaning of 18 U.S.C. § 1961(3).

### The Enterprise

144.    Chase, NCO and John Does 1-150 comprise three distinct groups of people that together form an enterprise within the meaning of 18 U.S.C. § 1961(4).  Each and every Defendant is associated with the enterprise.

145.    Chase, NCO and John Does 1-150 also qualify as separate and distinct enterprises within the meaning of 18 U.S.C. § 1961(4).

146.    The purpose of the enterprise or enterprises ("Enterprise") is to extract money from consumers by (a) collecting on "debt" and not recording payment, (b) pressuring customers to pay "debt" that is not really owed and collecting on such debts, (c) obtaining judgments on "debts" by presenting fraudulent affidavits and information to courts and (d) using those judgments to collect on the debts and/or to sell the debts.  This is accomplished by, *inter alia* (a) Chase and NCO's serial record-keeping deficiencies, including deficiencies that result in payment not being recorded and in "debts" being misattributed, (b) Chase and NCO's systematic robo-signing and creation of official-appearing "verified" affidavits and other evidence that has not been verified, and by (c) all of Defendants' use of the foregoing to unlawfully collect money

from credit card customers.  The relationships between the three groups of defendants are longstanding.

147.    The Enterprise has, for more than four years, been engaged in, and continues to engage in, activities that affect interstate commerce.  Defendants' unlawful enterprise in violation of RICO has been and remains longstanding, continuous, and open-ended.

### The Pattern of Racketeering – Mail and Wire Fraud

148.    Defendants, individually and collectively, as an Enterprise, have engaged, directly and indirectly, in a pattern of racketeering activity, as described below, in violation of 18 U.S.C. § 1962(c) and (d).

149.    Defendants, acting individually and as part of the Enterprise, have devised a scheme to defraud and to obtain money by means of false or fraudulent pretenses and representations.  The scheme includes but is not limited to:

a.    Intentionally failing to properly record payment of "debts";

b.    Chase's knowing transmission of inaccurate records of "debts" to NCO;

c.    NCO's knowing receipt of inaccurate records of "debts" from Chase and Other Creditors;

d.    NCO's process of fraudulently validating the debts;

e.    Chase's failure to transmit accurate payment records to NCO, including when payments were received subsequent to transmission of a "debt" to NCO;

f.    Defendants' collective role in producing and filing fraudulent affidavits and court documents that falsely attest to the validity of "debts", that falsely attest to personal knowledge not possessed by the affiants, and that make other untrue representations;

g.    Misrepresenting that Defendants are in possession or could obtain documentation of the validity of the alleged "debts", when, in fact, they do not possess and could not obtain such documentation;

150.    Defendants, acting individually and as part of the enterprise have made specific misrepresentations, *inter alia*, as follows:

a.    On June 19, 2006, Chase accepted payment of $410.00 from Ms. Sierra and did not credit her for that payment.

b.    On July 18, 2006, Chase accepted payment of $402.00 from Ms. Sierra and did not credit her for that payment.

c.    On August 28, 2006, Chase accepted payment of $450.00 from Ms. Sierra and did not credit her for that payment.

d.    On September 25, 2006, Chase accepted payment of $500.00 from Ms. Sierra and did not credit her for that payment.

e.    On February 5, 2008, Chase or NCO settled all credit card "debts" with Ms. Sierra for $9,000, yet continued to collect on "debts" subsequently.

f.    NCO and John Does attempted to collect on these bogus "debts."

g.    NCO and possibly Chase or other Defendants created a nonexistent Washington Mutual account in Ms. Sierra's name and attempted to collect money by alleging Ms. Sierra owed a "debt" on the nonexistent account.

h.    NCO and John Doe Defendants submitted false documentation in state court in an attempt to force Ms. Sierra to pay the nonexistent "debt" to Washington Mutual.

i.    Defendants scheme with respect to Plaintiff was typical of the manner in which it attempted to collect on other bogus debts from members of the Class and Subclass.

151.    Defendants, acting individually and as part of the Enterprise, have used the mails and wires and have caused the mails and wires to be used, or reasonably knew the mails and wires would be used, in furtherance of their fraudulent scheme.  Specifically,

a.      Chase sent numerous false statements via mails and wires, including, *inter alia*:

    i.      A contemporaneous credit card statement that did not credit Ms. Sierra for the payment of $410.00 that Chase took on June 19, 2006.

    ii.     A contemporaneous credit card statement that did not credit Ms. Sierra for the payment of $402.00 that Chase took on July 18, 2006.

    iii.    A contemporaneous credit card statement that did not credit Ms. Sierra for the payment of $450.00 that Chase took on August 26, 2006.

    iv.     A contemporaneous credit card statement that did not credit Ms. Sierra for the payment of $500.00 that Chase took on September 25, 2006.

    v.      A February 25, 2008, settlement agreement, which specifically stated "[w]e will stop all efforts to collect[.]"

    vi.     All other inaccurate documents relating to "debts" which Chase claimed Ms. Sierra and members of the Classes owed.

b.      NCO and John Doe Defendants sent numerous false statements via the mails and wires, including, *inter alia*:

    i.      Falsely reporting to credit agencies that Ms. Sierra owed $24,224.00 to "SST/CIGPF1Corp."

    ii.     Serving and filing a verified complaint in Texas state court on August 12, 2011, which alleged that Ms. Sierra owed an "outstanding debt" which was originally due to Washington Mutual of $42,957.88.

35

iii.     Making numerous similar false statements regarding Plaintiff and members of the Classes.

c.     Defendants have unlawfully used the mails and wires on, at minimum, hundreds of thousands of other occasions in connection with their attempts to collect bogus debts from other Members of the Classes.

152.    Defendants have used the mails and wires in connection with every "debt" payment for which they did not credit their customers and in connection with every invalid "debt" on which they collected or tried to collect. Each use of the mails and wires has furthered the fraudulent scheme and enabled Defendants to take money from Plaintiff and members of the Classes by means of false pretenses and representations.

153.    On information and belief, each and every Defendant has specific knowledge that the mails and wires are being utilized in furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that the mails and wires would be used because debt collection is routinely conducted by mail and the governing statutes in litigation and debt collection make use of mails and wires mandatory.

154.    Each of the uses of the mails and wires in connection with Defendants' schemes to defraud, spanning a period in excess of four years, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343, and thus is also a predicate act, which taken together, constitute "a pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

155.    In connection with Defendants' schemes, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 *et seq.*, and on numerous other occasions over a substantial time period within ten years of each other. The acts of

racketeering are an ongoing part of Defendants' regular way of doing business. The predicate acts have been and, until this Court puts a stop to it, will be, repeated.

### The Relationship of The Pattern Of Racketeering Activity To The Enterprise

156.     As described above, the goal of Defendants' enterprise is to obtain money from Ms. Sierra and Members of the Classes by way of collecting on "debts" which are not lawfully owed.

157.     The pattern of racketeering activity described above is integral to Defendants' scheme. Without engaging in mail and wire fraud, Defendants would be unable to obtain massive amounts of money from Plaintiff and members of the Classes that Defendants have obtained to date and will continue to obtain.

158.     Each Defendant, individually and as a member of the Enterprise, has conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above. Accordingly, each Defendant has violated 18 U.S.C. § 1962(c).

159.     Moreover, each Defendant has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), including the numerous predicate acts of mail and wire fraud described above, and has thus violated 18 U.S.C. § 1962(d).

160.     As a direct and proximate result of the RICO violations described herein, including Defendants' false statements through the mails and wires, Ms. Sierra and the members of the Classes have suffered substantial injuries. Ms. Sierra and members of the Classes have been threatened and forced to pay "debts" they did not owe without proper due process, thus constituting an injury to Plaintiff's property within the meaning of 18 U.S.C. § 1962, by the actions of Defendants and their co-conspirators in violation of 18 U.S.C. §§ 1962(c) and (d).

161.    Defendants' conduct has involved and continues to pose a threat of long term criminality since it commenced many years ago and has continued to the present.  The pattern of racketeering has been directed towards at least tens of thousands of persons, including Ms. Sierra, and the pattern has spanned many years.

162.    Moreover, in February 2012, the Attorneys General of nineteen (19) states entered into a settlement with NCO to resolve allegations of deceptive and unfair debt collection practices, including allegations that consumers were forced to pay NCO for debts which they did not owe.  The Attorneys Generals' investigation found NCO violated the FDCPA, FCRA and state consumer protection laws.  Those findings are incorporated by reference herein.

163.    For Defendants' serial violations of 18 U.S.C. § 1962, Plaintiff and Members of the Classes are entitled to recover compensatory and treble damages in an amount to be determined at trial, to a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future, and to any additional relief this Court deems just and proper.

### COUNT II
### UNJUST ENRICHMENT
#### (On Behalf Of Plaintiff And All Classes)

164.    Plaintiff adopts and incorporates by reference the foregoing Paragraphs of the Complaint as if fully set forth herein.

165.    Defendants were unjustly enriched by virtue of the scheme described herein.

166.    Defendants' enrichment came at the expense of Ms. Sierra and members of the Classes.

167.    Defendants are sophisticated corporate entities and law firms; Defendant Chase is a multinational corporation with assets exceeding $2 trillion, Defendant NCO has annual revenue

38

well in excess of $1 billion, and the John Does are well-funded and experienced debt collection law firms. Yet Defendants unjustly supplemented their enormous profits at the expense of regular people like Ms. Sierra and members of the Classes, people who did not think Defendants would systematically steal from them. The circumstances are therefore such that equity and good conscience demand that Defendants make restitution.

168.    Moreover, in February 2012, the Attorneys General of nineteen (19) states entered into a settlement with NCO to resolve allegations of deceptive and unfair debt collection practices, including allegations that consumers were forced to pay NCO for debts which they did not owe. The Attorneys Generals' investigation found NCO to have violated the FDCPA, FCRA and state consumer protection laws and those findings are incorporated by reference herein.

169.    For Defendants' unjust enrichment, Ms. Sierra and the members of the Classes are entitled to recover compensatory damages, and to any additional relief this Court deems just and proper.

## COUNT III
### FCRA (28 U.S.C. § 1681 *et seq.*)
### (On Behalf Of Plaintiff And The Consumer Reporting Subclass)

170.    Plaintiff adopts and incorporates by reference the foregoing Paragraphs of the Complaint as if fully set forth herein.

171.    Plaintiff and the other members of the Consumer Reporting Subclass are "consumers" as that term is defined in the FCRA 28 U.S.C. §1681b(c).

172.    Defendants are furnishers of consumer information to "consumer reporting agencies" and as that term is defined in the FCRA §1681a(f).

173.    FCRA 15 U.S.C. §1681s-2, provides, in relevant part, that furnishers of consumers' information to consumer reporting agencies must provide accurate information:

39

(a) Duty of Furnishers of Information to Provide Accurate Information

(1) Prohibition

> (A) Reporting information with actual knowledge of errors. A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate.

174.    In addition, the FCRA 15 U.S.C. §1681s-2(a)(l)(B) requires furnishers to correct and update information provided to consumer reporting agencies if the furnisher determines that the information provided is not complete or accurate.  The statute also requires the furnisher to stop providing inaccurate consumer information to credit reporting agencies.

175.    Defendants have violated the FCRA 15 U.S.C. §168Is-2 by: providing information relating to consumer credit reporting agencies which Defendants know, or reasonably should know, or are reckless in not knowing, is false; failing to provide complete and accurate information, including failing to report consumer collections accounts as "paid" or "settled" as a result of the RBA bug or otherwise; orchestrating the entry of judgments against consumers for debt which is not owed, in whole or in part, and which Defendants know or reasonably should know and fail to verify is not owed by the consumer, in whole or in part; and by failing to correct incomplete or inaccurate information which has been provided to the consumer credit reporting agencies.

176.    Moreover, in February 2012, the Attorneys General of nineteen (19) states entered into a settlement with NCO to resolve allegations of deceptive and unfair debt collection practices, including allegations that consumers were forced to pay NCO for debts which they did not owe.  The Attorneys Generals' investigation found NCO to have violated FCRA and those findings are incorporated by reference herein.

177.   As a result of Defendants violations of the FCRA, Plaintiff and the other members of the Consumer Reporting Subclass have suffered damages.

## COUNT IV
### FDCPA (15 U.S.C. § 1692 *et seq.*)
### (On Behalf Of Plaintiff And All Classes)

178.   Plaintiff adopts and incorporates by reference the foregoing Paragraphs of the Complaint as if fully set forth herein.

179.   Defendants are debt collectors as that term is defined in the FDCPA.  15 U.S.C. § 1692a.

180.   A debt collector may not "use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  Specifically, a debt collector may not falsely represent "the character, amount or legal status of any debt."  15 U.S.C. § 1682e(2)(A).  A debt collector also may not use "any false representation or deceptive means to collect or attempt to collect any debt."  15 U.S.C. § 1692e(10).

181.   Furthermore, a debt collector may not "use unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C. § 1692f.

182.   Nor may a debt collector "engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt."  15 U.S.C. § 1692(d).

183.   As set forth above, Defendants violated the FDCPA by making false and misleading representations, and engaging in unfair and abusive practices.

184.   Moreover, in February 2012, the Attorneys General of nineteen (19) states entered into a settlement with NCO to resolve allegations of deceptive and unfair debt collection practices, including allegations that consumers were forced to pay NCO for debts which they did

not owe.  The Attorneys Generals' investigation found NCO to have violated the FDCPA and those finding are incorporated by reference herein.

185.    Defendants' violations of the FDCPA entitle Plaintiff and members of the Classes to their actual damages in an amount to be proved at trial, to statutory damages, costs and attorneys' fees, and to any additional relief this Court deems just and proper.

**COUNT V**
**BREACH OF CONTRACT**
**(On Behalf Plaintiff And The Breach Of Contract Subclass)**

186.    Plaintiff adopts and incorporates by reference the foregoing Paragraphs of the Complaint as if fully set forth herein.

187.    When Chase settled Ms. Sierra's "debt", and the "debts" of members of the Breach of Contract Subclass, it represented that it would "stop all efforts to collect."  In consideration, Ms. Sierra, and members of the Breach of Contract Subclass, paid money to settle their debts with Chase.

188.    After receiving consideration, Defendants continued to collect on "debts" from Ms. Sierra and the Breach of Contract Subclass.  Defendants thereby profited from breaching Chase's contract with Ms. Sierra and their contracts with the members of the Breach of Contract Subclass.

189.    All conditions precedent to Defendants' liability under these contracts have been performed by Plaintiff and the Class.

190.    For Defendants' breach of contract, Ms. Sierra and members of the Breach of Contract Subclass are entitled to recover compensatory damages, and to any additional relief this Court deems just and proper.

## COUNT VI
## TORTUOUS INTERFERENCE WITH CONTRACT
### (On Behalf Of Plaintiff And The Breach Of Contract Subclass)

191.    Plaintiff adopts and incorporates by reference the foregoing Paragraphs of the Complaint as if fully set forth herein.

192.    Defendants knew or should have known of the settlement agreement between Ms. Sierra and Chase.  Defendants knew or should have known of similar settlement agreements by members of the Breach of Contract Subclass.

193.    Defendants intentionally interfered with Chase's settlement agreements with Mrs. Sierra and with other settlement agreements between various Defendants and the Breach of Contract Subclass by attempting to collect on the same "debt."

194.    Defendants committed fraudulent, deceitful acts motivated by a desire for monetary gain, at the expense of Ms. Sierra and the Breach of Contract Subclass.

195.    For Defendants' tortuous interference with contract, Ms. Sierra and members of the Breach of Contract Subclass are entitled to recover compensatory damages, and to any additional relief this Court deems just and proper.

**WHEREFORE**, Plaintiff, on behalf of herself and all similarly situated victims of Defendants' unlawful scheme, respectfully requests that the Court:

A.    Certify the proposed Class and Subclass under Fed. R. Civ. P. 23, requiring notice thereto to be paid by Defendants and appointing Plaintiff and her counsel to represent the Class;

B.    Impose appropriate Declaratory and Injunctive Relief, including declaring that Defendants' acts and practices constitute a violation of RICO, FDCPA, and FCRA and enjoining Defendants from engaging in the scheme and all of the related unlawful activity used to wrongfully obtain moneys from Plaintiff the other members of the Class and Subclass;

43

C.    Award actual damages to the Plaintiff and to the other members of the Class and
Subclass;

D.    Award statutory damages to Plaintiff and to the other members of the Class and
Subclass;

E.    Award treble damages to Plaintiff and to the other members of the Class and
Subclass;

F.    Award restitution to Plaintiff and to the other members of the Class and Subclass;

G.    Award to Plaintiff and the Classes attorneys' fees, costs, and expenses;

H.    Award the payment of interest to the extent allowed by law; and

I.    Grant such other and further relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and all others similarly situated, hereby demands a trial by
jury of any and all issues in this action so triable.

Dated:        White Plains, New York
              January 29, 2013


                        Respectfully submitted,

                        MEISELMAN, PACKMAN, NEALON,
                        SCIALABBA & BAKER P.C.

                        By: *Jeremiah Frei-Pearson*
                        Jeremiah Frei-Pearson (jfrei-pearson@mpnsb.com)
                        Todd S. Garber (tgarber@mpnsb.com)
                        D. Greg Blankinship (gblankinship@mpnsb.com)
                        1311 Mamaroneck Avenue
                        White Plains, New York 10605
                        (914) 517-5000

                        *Attorneys for Plaintiff and the Classes*

44